**TRUST CO. OF GEORGIA et al. v. UNITED STATES.**

No. 45667.

Court of Claims.

May 7, 1945.

W. A. Sutherland, of Washington, D. C. (Charles B. Lowndes and Sutherland, Tuttle & Brennan, of Washington, D. C., on the brief), for plaintiff.

J. W. Hussey, of Washington, D. C., and Samuel O. Clark, Jr., Asst. Atty. Gen. (Robert N. Anderson and Fred K. Dyar, both of Washington, D. C., on the brief), for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

WHITAKER, Judge.

The question presented in this case is the extent of the taxability of the gain derived in 1937 from the redemption by the Retail Credit Company of 545 shares of its own Class A preferred stock held by plaintiffs. The taxpayers claim that the gain is taxable as a capital gain to the extent of 30 percent as an ordinary sale of stock held for more than 10 years. The Commissioner taxed it at normal and surtax rates to the extent of 100 percent, on the theory that the gain was an amount "distributed in partial liquidation."

The facts surrounding the transaction are as follows: Prior to May 25, 1931, the Retail Credit Company of Atlanta, Georgia had outstanding 89,738 participating preferred shares of stock and 15,170 shares of common stock, each with full voting rights. The company decided to rearrange its capital structure so as to permit those who were in active management of the business to retain control of the company through ownership of the common stock and to give to other stockholders not in active charge of the management preferred stock having no voting rights. Accordingly, a resolution was adopted on April 27, 1931 authorizing such an amendment of the charter of the company, which was approved by the Superior Court of Fulton County, Georgia on May 25, 1931.

The amended charter authorized the issuance of 150,000 shares of no par value common stock and 50,000 shares of no par value Class A preferred stock. One share of the Class A preferred stock was to be issued for every five shares of the old participating preferred stock.

The Board of Directors was authorized to redeem any particular shares of the Class A stock it desired without pro rata restrictions, and to resell it at such price as might be fixed by the Board of Directors.

By proper resolutions of the Board of Directors the provisions of the charter were put into effect. The participating preferred stock was redeemed and one share of Class A preferred stock was issued for each five shares thereof. The common stock remained as before except that there was declared thereon a stock dividend of one share of Class A preferred stock for each five shares of common.

After the amendment of the charter Cator Woolford was the owner of both common stock and Class A stock of the company. On August 20, 1935, he transferred to plaintiffs in trust 1,150 shares of the Class A stock and 3,450 shares of the common stock, with authority to sell it according to a stated plan. By 1940 plaintiffs had sold all the common stock to employees of the company. They sold to the company itself 60 shares of the Class A stock in 1936 and 545 shares in 1937. The extent of the taxability of the gain derived from the sale of the 545 shares in 1937 is the question presented.

On the first of the year following the year the recapitalization was put into effect the Board of Directors authorized the company treasurer to purchase from anyone wishing to sell not more than 500 of the 22,296 outstanding shares of Class A stock at not more than $100 a share plus accrued dividends. Similar resolutions were passed in the two succeeding years. On October 3, 1934, a resolution was passed offering stockholders who might wish to sell some or all their Class A stock not less than $99.00 per share therefor.

By May 8, 1935, a total of 3,701 shares had been purchased at prices ranging from $84.50 to $99.00 per share.

On May 8, 1935, the company, pursuant to resolution of its Board of Directors, wrote all its stockholders offering to purchase up to 1,127 shares of this stock at

$105.00 per share, the call price. In 1935 and 1936 there were purchased 1,317 shares. In 1937 an additional 1,111 shares, including 545 of plaintiffs', were purchased without previous authorization from the Board of Directors, but this was ratified later.

By the end of 1937 a total of 5,922 shares had been purchased, leaving outstanding 16,374 shares.

The purchases were from anyone wishing to sell and the amount purchased had no relation to the amount of the stock held by the seller. Purchases from stockholders owning more than 30 shares ranged from 13 per cent of their holdings to 100 per cent, and the prices paid ranged from $84.50 to $105.00.

The question is whether the sale by plaintiffs of one-half of their stock in 1937 comes within any of the provisions of section 115 of the Revenue Act of 1936 dealing with distributions of corporate earnings by corporations. The Commissioner treated the sale as a partial liquidation as defined in subdivision (i) and, hence, taxable as provided in subdivision (c).

Section 115 of the Revenue Act of 1936, 49 Stat. 1648, 1687, 26 U.S.C.A. Int.Rev. Acts, page 868, deals with "distributions by corporations." Subsection (a) defines a "dividend" as follows:

"The term 'dividend' when used in this title * * * means any distribution made by a corporation to its shareholders * * * (1) out of its earnings or profits accumulated after February 28, 1913 * * *."

By section 22 of the Act, 26 U.S.C.A. Int.Rev.Acts, page 825, the entire amount received as dividends is required to be included in gross income and is subject to both normal and surtax.

Subsection (c)[1] deals with "distributions in liquidation." It provides:

" * * * amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. The gain or loss to the distributee resulting from such exchange shall be determined under section 111, but shall be recognized only to the extent provided in section 112. Despite the provisions of section 117(a), 100 per centum of the gain so recognized shall be taken into account in computing net income, except in the case of amounts distributed in complete liquidation of a corporation. * * * In the case of amounts distributed * * * in partial liquidation * * * the part of such distribution which is properly chargeable to capital account shall not be considered a distribution of earnings or profits."

*     *     *     *     *

This made the gain derived on a partial liquidation taxable on the same basis as ordinary dividends.

Subsection (d) is concerned with "other distributions from capital." It provides that if the distribution is not in partial or complete liquidation and is not out of increase in value of property before March 1, 1913, and is not a dividend, then it is to be taxable, to the extent of the gain derived, as a gain from the sale or exchange of property, that is, as a capital gain. Such a distribution not being in the nature of a dividend is not taxable on the same basis as one.

Thus the statute recognizes that a corporation may acquire its own stock without the transaction being either a dividend or a partial liquidation.

Subsection (g)[2] relates to "redemption of stock." It is quoted in full:

"Redemption of stock. If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend."

Such a redemption, being essentially equivalent to a dividend, was made taxable as one.

Subsection (i)[3] reads:

"Definition of partial liquidation. As used in this section the term 'amounts dis-

---

[1] Subsection (b) of section 115 is not material to our inquiry.

[2] The intermediate subsections are not relevant.

[3] Subsections (h) and (j) are not material.

tributed in partial liquidation' means a distribution by a corporation in complete cancellation or redemption of a part of its stock, or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock."

█ From a reading of the section it seems to us that Congress' intention in the enactment of this whole section was to tax dividends at normal and surtax rates and to prevent tax avoidance by taxing as dividends any distribution of earnings or profits of a corporation which was the equivalent of a dividend, in whatever guise distributed.

Ordinarily a distribution of corporate earnings is in the form of a dividend, but Congress recognized that profits might be distributed in other forms, and so escape the tax on dividends, and thus in the various subsections Congress dealt with various transactions which were in the nature of dividends and provided that when the distribution took on that character it was taxable as such; otherwise, not.

One form in which earnings might be distributed in lieu of a dividend is by partial liquidation of the corporation, as in a case where the corporation has accumulated more assets than it needs to carry on its business, or where it wishes to curtail its activities. Where the corporation desires to liquidate in part, a certain proportion of the stockholdings of each stockholder is called in and in lieu thereof the assets of the corporation are "distributed" to them in proportion to the stock turned in. This contemplates, of course, a proportionate reduction in the stockholdings of each stockholder, either in one transaction or in a series of transactions. It contemplates equal treatment of all stockholders in proportion to their stockholdings. It contemplates a "distribution" among all the stockholders of the corporation's assets in proportion to their stockholdings. Indeed, the entire section 115 deals with "distributions" by corporations, that is, a division among the stockholders of corporate assets. It had in mind the taxation of a distribution of earnings as dividends, and the taxation of schemes evolved to escape the tax on dividends.

If this is correct, then it is plain that a corporation's dealings with a lone stockholder, or any number of them less than all, does not come within the ambit of the section. This being the intention of Congress, it was accordingly provided in subsection (d) that if a distribution was made which was not in partial liquidation or was not a dividend, it was taxable only as is the gain from a sale or exchange of property. It was thus recognized that a corporation might acquire its stock in a transaction which did not amount to a distribution of earnings equivalent to a dividend. If so, it was not taxed as such.

This intention is further shown by subsection (g). This section provides for the taxation, on the same basis as dividends, of only those redemptions of stock which are "essentially equivalent to the distribution of a taxable dividend." The purchase of stock from a sole stockholder bears not the slightest resemblance to the distribution of a dividend.

If plaintiffs had sold the stock in question to anyone other than the corporation, the gain derived would have been taxable as a capital gain only to the extent of 30 percent thereof. For what reason would Congress have desired to tax the gain at normal and surtax rates to the extent of 100 percent if the sale was to the corporation itself? We can think of none, unless the gain was essentially equivalent to a dividend, which was so taxable. A gain derived by one stockholder only has none of the elements of a dividend.

██ It is true, of course, that if all the purchases by the corporation taken together accomplish the same result as the declaration of a dividend, the gain derived would be taxable as would a dividend; but that is not the case here. Some stockholders of the Retail Credit Company got $83.50 for their stock and others got prices ranging up to $105.00. Some stockholders sold all their stock, some one-half of it, and some much less, and presumably some sold none. The company's stockholders, therefore, did not share in the earnings of the company in proportion to their stockholdings, as they are entitled to do in the case of a distribution of a dividend or any distribution in the nature of a dividend.

That this is a correct interpretation of the intent of Congress is shown by the report of the Finance Committee of the Senate on the 1934 Act (Sen.Rep.No.558, 73rd Cong. 2d Sess. p. 37), which first carried this provision. It reads in part:

"Under existing law a distribution in liquidation of a corporation is treated in

the same manner as a sale of stock. This rule has serious objections, as it permits wealthy stockholders to *escape surtax upon corporate earnings or profits distributed in the form of liquidating dividends* * * *. Your Committee recognizes that liquidating dividends do contain some of the elements of a sale in that the shareholder is relinquishing in whole or in part his investment in the corporation. On the other hand, they also contain *some of the elements of an ordinary dividend insofar as they represent a distribution of corporate earnings or profits.* * * * The House bill retains the principle of the present law of taxing to the shareholder only the amount by which the liquidating dividend exceeds the basis of the stock with respect to which the dividend is paid. *However, to prevent avoidance of surtax through liquidating dividends, the gain to the shareholder is made subject to both normal and surtax.* This is accomplished by taxing the gain in the same manner as if it were a gain from the sale * * * of a capital asset held for not more than one year, even though the shareholder may have actually held the stock upon which the dividend is paid for a longer period." [*Italics supplied.*]

This is further shown by the Senate Finance Committee Report on the 1942 Act (Sen.Rep.No.1631, 77th Cong. 2d Sess. p. 116). This reads in part:

"Under existing law * * * the gain realized from a distribution in partial liquidation is treated, despite the provisions of Section 117, as a short-term capital gain. *This treatment was occasioned by the facility with which ordinary dividends may be distributed under the guise of distributions in partial liquidation,* although Section 115(g) makes explicit provision for the treatment of such distributions as ordinary dividends. *Inequality results, however, under the existing law in the case of unquestionable bona fide redemptions of stock not equivalent in any way to the distribution of a taxable dividend.* It is believed that the proper application of section 115(g) will prove adequate to prevent *taxable dividends disguised as liquidations* from receiving capital gain treatment. Accordingly, this section of the bill eliminates the provision requiring the gain from a partial liquidation to be treated as a short-term capital gain." [Italics supplied.]

Not only does the transaction in this case not come within the spirit of the section, neither does it come within the letter of it. Subsection (i) defines a partial liquidation as "a distribution by a corporation in complete cancellation or redemption of a part of its stock." When a corporation purchases and retires and completely cancels one share of its stock, it pro tanto liquidates, but there has been no "distribution" of its assets in liquidation. It is only a "distribution" in liquidation with which subsections (c) and (i) are concerned. Furthermore, subsection (i) defines "amounts distributed in partial liquidation" as a distribution in "complete" cancellation or redemption of a part of its stock. Not only was there no "distribution" of assets among all the stockholders of the Retail Credit Company, but also there was no "complete" cancellation or redemption of the stock. As plaintiffs say, it was the certificates of stock that were cancelled; the stock was not. Under the amended charter the directors had the right to resell the stock at any time, at any price, without limitation. This charter provision was never amended or repealed. So long as it was in effect, the stock was not cancelled. There could be no "complete" cancellation of this stock so long as this charter provision remained in effect. Knickerbocker Importation Co. v. State Board of Assessors, 74 N.J.L. 583, 65 A. 913, 7 L.R.A.,N.S., 885.

The transaction, therefore, does not come within the letter of subdivision (i) and, for the reasons stated above, we do not think it comes within its spirit.

The Circuit Court of Appeals for the Fifth Circuit in Hill v. Commissioner of Internal Revenue, 5 Cir., 126 F.2d 570, held that the gain derived in a similar transaction was subject to tax at the normal and surtax rates. Its decision was based alone on the premise that the transaction came within the letter of subsection (i). For the reasons stated, we do not think it does.

Defendant also cites Cohen Trust v. Commissioner of Internal Revenue, 3 Cir., 121 F.2d 689. In that case the company offered to purchase 10,000 of the 11,116 shares of its outstanding preferred stock. A total of 8,705 shares were acquired, and then the balance of the stock was called and the charter of the company was amended so as to eliminate from its capital struc-

481

ture all of this class of stock. All of the stock was purchased and called at the same price. Here there was a "complete cancellation" of the stock. The facts of that case and in the one at bar are essentially different.

We are of opinion plaintiffs are entitled to recover the sum of $11,730.41 with interest as provided by law from October 19, 1939. Judgment for this amount will be entered. It is so ordered.

WHALEY, Chief Justice, concurs.

LITTLETON, Judge (concurring).

Defendant appears to rely upon the number of acquisitions by the Retail Credit Company of its Class A preferred stock in support of its position that the amounts paid for such stock were distributions in partial liquidation, but there is nothing in the record to show or indicate that there was any concerted action or intention on the part of the company and the stockholders or that there was any intention or scheme by the corporation, or by any stockholder, such as was contemplated by Congress in sec. 115, to enable any stockholder to escape normal and surtax on the profit derived from the sale of stock by using the capital gains provision of the taxing act on distributions in the nature of dividends. So far as the evidence shows, the Retail Credit Company simply decided to acquire some of its outstanding Class A preferred stock, not for the purpose of completely cancelling it, but subject to reissuance or sale. It had a right under the statute to do this without rendering the gain to the stockholder taxable one hundred percent as a dividend. Reissuance or sale of treasury stock so acquired gives rise to a taxable gain or a deductible loss to the corporation. Edwin L. Wiegand Co. v. United States, 60 F.Supp. 464, and cases therein cited.

There is a complete absence of any evidence to show that in purchasing the Class A stock from certain stockholders who were willing to sell it the Retail Credit Company did so for the purpose of completely canceling and retiring the stock. It must be assumed that Congress was aware of the fact disclosed by numerous published decisions relating to income taxes that corporations frequently acquire their own stock and hold it as treasury stock subject to reissue or resale; that, in so acquiring stock, they often cancel the certificates but do not completely cancel the stock as such; that corporations also frequently reissue or resell such stock. It must also be assumed that when Congress enacted the Revenue Act of 1936, in subsection (c) of which it inserted the provision relied upon by defendant which related to amounts distributed in partial liquidation, i. e., "despite the provisions of sec. 117(a), 100 percentum of the gains so recognized shall be taken into account in computing net income," it was aware of the Treasury Regulation, art. 543 regs. 65, in effect from May 2, 1934, that a resale by a corporation of its own stock results in a taxable gain or a deductible loss. From this it must be concluded that Congress did not intend that such acquisitions or bona fide redemptions of stock should, standing alone, be treated as distributions in partial liquidation, and that it was for this reason that sec. 115(i) defined a distribution in partial liquidation as being a distribution "in complete cancellation or redemption of part of its stock." The instant case is therefore, on its facts, excluded by sec. 115(i) from the provisions of 115(c) upon which the defendant relies.

The gain received by plaintiffs from the sale of the 545 shares of stock in question would, of course, be taxable 100 percentum under sec. 115(g), even though the stock was not completely cancelled, if defendant had been able to submit sufficient evidence to show that in acquiring the stock the Retail Credit Company cancelled or redeemed it at "such time and in such manner as to make the distribution and cancellation or redemption essentially equivalent to a taxable dividend," but we have no such evidence and there is no basis in the facts of record for the inference that, in so acquiring the stock, there was present a scheme to make distributions in partial liquidation in the guise of purchasers of stock, and thereby enable the stockholders to escape or avoid the full normal and surtax on amounts which were in effect "distributions."

We are not, therefore, justified in finding that the transaction in question was a distribution by the Retail Credit Company in partial liquidation within the meaning of sec. 115(c), (g), or (i). Plaintiffs are therefore entitled to the benefit of the capital gain provision of the taxing act.

MADDEN, Judge (dissenting).

Our question is whether the payment made in 1937 to the plaintiffs for their stock was, in the circumstances here present, a "distribution by a corporation in complete cancellation or redemption of a part of its stock * * *," which is the definition given in Section 115(i) to the words "amounts distributed in partial liquidation" which are used in subsection (c) of that section in the Revenue Act of 1936, which subsection required the profits included in amounts so "distributed" to be returned 100% for taxation no matter how long the stocks had been held.

The court holds that their transaction is not covered by the statutory language; that the transaction did not result in "complete cancellation or redemption of a part" of the corporation's stock, because of the provision of the amended charter that any issued stock redeemed, purchased, or otherwise acquired by the corporation might be sold by the corporation at whatever price the board of directors fixed. This provision, the court holds, made the stock purchased from the plaintiffs and others "treasury stock" not completely cancelled or redeemed. I do not agree. The board of directors, in its resolution of October 3, 1934, expressed its intention to reduce the number of shares of preferred stock to 18,000, and in its resolution of May 8, 1935, authorized its treasurer to notify all holders of Class A preferred stock of its offer to "purchase for retirement" a sufficient number of shares "to complete its financial program." That the directors intended to eliminate the purchased shares from the corporation's financial structure is plain. Stockholders who, like the plaintiffs, also owned common stock of the corporation might well have been willing to sell their preferred stock for retirement, when they would not have been willing to sell it for reissue to compete for the future earnings of the corporation, or to compete in the market with the shares of preferred stock which the stockholders retained. The officers of the corporation did "cancel" the stock as effectively as that could be done by physical acts. None of it was ever reissued.

If a taxing body had imposed a per share tax on the corporation's capital, surely it would not have been taxable on these shares. I think the provision in the amended charter authorizing the cor-

poration to reissue acquired stock was intended only to remove any legal question as to whether the mere acquisition by the corporation of its own stock would, ipso facto, prevent its reissue, and was not intended to tie the corporation's hands so that it could not, if it so desired and intended, cancel some of its stock. The provision in the resolutions adopted in January of 1932, 1933, and 1934 that the shares purchased under those resolutions should be cancelled, but without prejudice to the right of the corporation to reissue them, was omitted from the resolution of October 3, 1934, and subsequent resolutions, and its omission, in connection with the language and conduct which followed, shows, I think, that the corporation intended to "completely cancel" the shares acquired thereafter.

The court holds that the statutory language of Section 115(c) and (i) does not fit the transaction here involved because the payment made to the plaintiffs was not a "distribution" but was the mere payment of a price for the purchase of some shares. In the statute, Congress was dealing with a number of different kinds of dispositions by a corporation of its accumulated earnings, and was attaching different consequences, in re taxability, to them. It was, it seems, seeking a neutral word which would not, in itself, connote that the disposition referred to was a dividend, or so like a dividend that it ought to be taxed as such, or was a mere payment of a purchase price, which ought to be taxed like the sale of a horse. Congress was devising a meticulous statutory scheme for dealing with the problem of the disposition by corporations of their accumulated profits to their stockholders, as distinguished from their spending those profits with outsiders. I can think of no generic word more suitable for the purpose than the word "distribution."

That Congress did not use the word "distribution" in the sense of the payment of a dividend is evident, since dividends ordinarily regarded as such, and by the statute taxed as such, are only one of many kinds of payments dealt with by Section 115, whose heading is "Distributions by Corporations." And Section 115(g), in providing for the special treatment of a "distribution" in cancellation of stock which, because of its time and manner, is essentially equivalent to the declaration of

a taxable dividend, recognizes that many other "distributions" are not dividends or their equivalents. The only other meaning, narrower than "payment," which occurs to me for possible application to the word "distribution" in this connection, is "pro rata payment" among all holders of the stock in question. But that would mean that if a corporation had reserved the right to call for retirement a specified number of its shares, at one time, or at specified times, by lot, or by selection made by the board of directors, the payments would not be "amounts distributed in partial liquidation" nor taxable as such under Section 115(c). Yet I have no doubt that such payments would be so taxable. The final call which would bring in all the remaining outstanding shares of the kind subject to call would, by any possible meaning of the word "distribution," be taxable as a "partial liquidation" under Section 115 (c). I see no reason why those stockholders should be taxed three times as much as the ones whose stock was called earlier.

The plaintiffs' stock was not called pro rata, or by lot, or by selection of the board of directors, or at all. It was purchased as a result of a general offer made by the corporation to its stockholders, which reminded them that it could call their stock, but that instead it was offering the call price to those willing to sell. It thus offered an opportunity for self-selection, and the plaintiffs sold a part of their stock. If after having purchased all the stock it could get from willing sellers, the corporation had needed more and had called it pro rata from all stockholders, that would have been a "distribution," but it would be hard to find a reason why the stockholders, including the plaintiffs, should pay three times as much taxes on their surrenders of stock in response to the call as on their earlier sales.

The court's decision really, it seems to me, is aimed at the equity and wisdom of Section 115(c) of the 1936 Act. That the criticism has validity is shown by the fact that Congress repealed the part of it here in litigation in 1942. Its apprehension, in 1936, that dispositions by corporations to their stockholders were so fraught with possibilities of evading taxes that so-called "partial liquidations" must be taxed substantially like ordinary income, yielded in 1942 to recognition that real evasions could

be adequately taxed under Section 115(g), and that other partial liquidations belonged, in fairness, with complete liquidations, in the taxing scheme. But the nonretroactive repeal in 1942 of the provisions of the statute under which the plaintiffs were taxed in 1937 is not a reason why we should now give the former statute a narrower construction than we would have done before it was modified.

JONES, Judge, took no part in the decision of this case.