George F. FERRIS

v.

The UNITED STATES.

No. 182-52.

United States Court of Claims.

Nov. 8, 1955.

Richard O'C. Kehoe, Utica, N. Y., for plaintiff. Ferris & Kehoe, Utica, N. Y., were on the brief.

H. S. Fessenden, Washington, D. C., with whom was Asst. Atty. Gen., H. Brian Holland, for defendant. Andrew D. Sharpe and Ellis N. Slack, Washington, D. C., were on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

MADDEN, Judge.

The plaintiff has been, since September 1940, president and a director of The Matheson Company, Inc., hereinafter called Matheson. Earlier in 1940 the Interim Corporation, which had been formed by the plaintiff and other persons, bought all the outstanding stock of Matheson. Interim then merged with Matheson and adopted the Matheson name for the corporation which resulted from the merger.

In the formation of the Interim Corporation, 400 shares of preferred stock had been issued for $100 per share, and with each share of preferred was given one share of common stock. After the merger the outstanding stock of the new Matheson was 400 shares of preferred, 400 shares of common in the hands of the holders of the preferred, and 216 shares of common which had been deposited with a trustee, to be delivered to the plaintiff when all the preferred stock had been redeemed, if that should be accomplished by the year 1950. In the meantime the plaintiff was to have the right to vote the 216 shares, and to receive any dividends payable on it. Only the common stock had voting rights.

Matheson conducted its business in leased property. In 1942 the owner of that property resolved to sell it, and it was necessary for Matheson to make some arrangement for its purchase in order to be able to continue to occupy it. Ferlan Realty Corporation, hereinafter called Ferlan, was formed to purchase the property. The plaintiff was the president of Ferlan. The cost to Ferlan, including the cost of fees, surveys, back taxes and other expenses was $13,-566.24. Ferlan issued 616 shares of common stock and distributed them, share for share, to the common stockholders of Matheson. Ferlan leased the property which it had acquired to Matheson at an annual rental of $3,600 per year.

In 1944, the plaintiff was negotiating with the Federal Deposit Insurance Corporation for the settlement of a debt owed by the plaintiff and dating back to 1929. By February 10, 1945, the principal and interest of the debt amounted to $37,384.23. The plaintiff had been advised that the FDIC intended to take steps to enforce the payment of the debt

and that it knew of some person or persons who would pay $25,000 for the interest which the plaintiff and his wife owned in Matheson. In January 1945, the plaintiff offered the FDIC $25,000 in cash in full settlement of his debt. The FDIC accepted the offer.

For the raising of the $25,000, the only valuable asset which the plaintiff had was his interest in Matheson and Ferlan. Through his control of Matheson, a new issue of 616 shares of Class A stock was authorized, having voting rights identical with common shares and callable at $80 per share. The Class A stock was to be offered in exchange for the shares of· Ferlan, on a share-for-share basis, and when Matheson should have acquired all the stock of Ferlan, Ferlan was to be dissolved, and Matheson would own the property in which it carried on its business.

In 1945, the plaintiff and his wife indorsed the certificates for 323 shares of the Class A stock to Matheson for redemption and were paid $80 a share for it. Again in January 1946 the plaintiff turned in for redemption 63 shares of Class A stock and was paid $80 a share for it. In 1945 other stockholders turned in for redemption 29 shares, and in 1946, three shares. Matheson did not, in those years, issue any formal authorization of or call for redemption. But at the time of the redemption of the stock of the plaintiff and his wife, as noted above, they owned a majority of the voting stock of Matheson. After these redemptions they owned slightly less than a majority of the voting stock.

In his income tax returns for the years 1945 and 1946, the plaintiff treated his profit on the redemption of his Class A stock as long term capital gain and therefore returned only 50 percent of it as taxable income. The tax authorities, however, treated the profit as a dividend, taxable as ordinary income. The plaintiff paid the taxes demanded, and filed timely claims for refund, which claims were disallowed.

Section 115(g) of the Internal Revenue Code of 1939, 53 Stat. 48, says:

"(g) *Redemption of Stock.*—If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend."

Before the redemptions here involved Matheson had a surplus of some $36,000. There is left for our consideration, therefore, only the question whether the redemption of the plaintiff's stock was accomplished in such a manner as to make the payments to him "essentially equivalent to the distribution of a taxable dividend."

Treasury Regulations 111, promulgated under the Internal Revenue Code of 1939, say, in Section 29.115-9:

"* * * (b) The question whether a distribution in connection with a cancellation or redemption of stock is essentially equivalent to the distribution of a taxable dividend depends upon the circumstances of each case. A cancellation or redemption by a corporation of a portion of its stock pro rata among all the shareholders will generally be considered as effecting a distribution essentially equivalent to a dividend distribution to the extent of the earnings and profits accumulated after February 28, 1913. On the other hand, a cancellation or redemption by a corporation of all of the stock of a particular shareholder, so that the shareholder ceases to be interested in the affairs of the corporation, does not effect a distribution of a taxable dividend * *."

While the regulation just quoted does not literally cover the instant situation, we think the reason inherent in the reg-

ulation is applicable. A dividend is a pro rata distribution to stockholders in proportion to their holdings. If they surrender for cancellation a proportionate part of their stock, and receive for the surrender a proportionate payment out of earnings, they have the money, and still have the same proportionate interest in the corporation which they had before the surrender. Their interest in the corporation would have been the same if they had received their payments in the express form of dividends, without the surrender of a part of their stock.

In the instant case, the plaintiff's surrender for redemption in 1945 of 323 shares of his Class A stock reduced his holdings from 774 shares of voting stock, 63 percent, to 451 shares, 51.83 percent. It also eliminated his right to receive cumulative dividends of $4.80 per share on the 323 shares redeemed, though the other holders of Class A stock continued to receive such dividends. The surrender for redemption by the plaintiff in 1946 of 63 additional shares of Class A stock reduced his holdings of voting stock to less than half, thus depriving him of control of the company.

Although the Treasury regulation quoted above speaks of a redemption of all the stock of a particular shareholder as not being the equivalent of a taxable dividend, we see no reason why the redemption of a part of a shareholder's stock should have a different effect. It changes, *pro tanto*, his interest in the corporation in the same way that redemption of all his stock would do.

The instant case seems to us to be controlled by this court's decision in Trust Company of Georgia v. United States, 60 F.Supp. 470, 104 Ct.Cl. 150. Here, as in that case, the payments were not equivalent to, but were essentially different from, dividends.

We may add that we see no evidence that the transaction here under consideration was motivated by a purpose to evade taxes. It was necessary for the plaintiff to raise cash, to take advantage of the chance to settle his debt to the FDIC and prevent it from taking all his interests in Matheson and Ferlan. He got a better price by selling a part of those interests to Matheson and also kept the stock out of the hands of strangers. These were natural and proper business motives, regardless of their tax consequences.

The plaintiff is entitled to recover, with interest according to law. Entry of judgment is suspended to await the filing by the parties of a stipulation showing the amount due, in accordance with this opinion.

It is so ordered.

JONES, Chief Judge, and LARAMORE, WHITAKER and LITTLETON, Judges, concur.