## TOOTLE v. COMMISSIONER OF INTERNAL REVENUE, and five other cases.

### Nos. 9269–9274.

Circuit Court of Appeals, Eighth Circuit.

April 13, 1932.

Richard L. Douglas, of St. Joseph, Mo. (Brown, Douglas & Brown, of St. Joseph, Mo., on the brief), for petitioners.

Helen R. Carloss, Sp. Asst. to the Atty. Gen. (G. A. Youngquist, Asst. Atty. Gen., Sewall Key, Sp. Asst. to the Atty. Gen., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and Philip A. Bayer, Sp. Atty., Bureau of Internal Revenue, both of Washington. D. C., on the brief), for respondent.

Before STONE and KENYON, Circuit Judges, and CANT, District Judge.

STONE, Circuit Judge.

These are petitions to review redeterminations of the income taxes of petitioners for 1926. Each petitioner was a common stockholder in the Aunt Jemima Mills Company (a Delaware corporation), and the controversy, in each case, is whether a dividend paid in 1925 is to be treated as an ordinary or as a dividend in course of liquidation. The taxpayers included it in their return as an ordinary dividend. The commissioner and the Board of Tax Appeals determined it to

be a partial dividend in a liquidation and, as such, taxable under section 201 (c) of the Revenue Act of 1926 (USCA, title 26, § 932, subd. c, 44 Stat. 9, 10).

The facts are stipulated and are as follows: The Aunt Jemima Mills Company was a Delaware corporation with a large amount of non-par value stock outstanding in the hands of various holders, including these petitioners. As of October 31, 1925, the balance sheet of the company showed surplus and earnings of $870,176 (including profits for 1925 of $363,296.97 and cash in banks and on hand of $146,330.19). On November 14, 1925, the company officers sent out notices for a stockholders' meeting, upon November 24, 1925, to consider the sale of the property and business to the Quaker Oats Company. This notice and a blank proxy were inclosed in a letter to the stockholders. Each of these stated that the Quaker Oats Company had made an offer to purchase "all of its property and assets, including its business and good will, except its cash on hand and its claim or claims against the United States for refund of Federal taxes" (not material here), and that the board of directors thought the offer should be accepted. In the letter, it was stated that the directors believed that the purchase price "with cash on hand" would be sufficient to pay "at least eighty dollars ($80.00) per share for the outstanding common stock of the company," and that "under this offer it is possible that the returns to holders of common stock might be slightly in excess of eighty dollars per share."

The stockholders' meeting authorized the sale, and a contract of sale was entered whereby the company sold and delivered, as of that date (November 24, 1925), all of the property, assets, business, and good will, "except only the cash on hand and in bank of the first party on October 31, 1925, as shown on said balance sheet, and the claims of the first party against the United States Government for a refund of Federal taxes." On the price of $4,202,077.28, a down payment of $2,000,-000 was made. The balance was payable $1,-202,077.28 upon delivery of assignments of all trade-marks and trade-mark registrations, and $1,000,000 within fifteen days after delivery of deeds to the real estate. The purchaser was to have the right to use the corporate name of the seller as far as the purchaser desired "to enable it to obtain the full benefit of the good will and of the business hereby sold." The company agreed "as soon as practicable after the transfer of the property * * * to liquidate and to distribute its assets among the stockholders, and will there-

upon be dissolved as a corporation * * * which shall be completed not later than one year from the date of such transfer" or it would "distribute its assets among its stockholders, and will thereupon cause its capital stock to be reduced to a nominal amount, and transfer and assign such nominal amount of its capital stock" to the purchaser.

The initial payment of $2,000,000 was made on November 25, 1925. On December 12 or 15, 1925, the directors passed a resolution that "they deemed it advisable and most for the benefit of the corporation that it should be dissolved, and that its debts should be paid and that the remainder of its cash and the proceeds derived from the sale of its properties and assets should be distributed to its stockholders and the business of the corporation finally liquidated," and then called a meeting of the stockholders for January 15, 1926, "to consider the question of the final dissolution of the corporation and the distribution of its cash and the proceeds derived from its property and assets, after the payment of its debts, to its stockholders." Thereafter, and on the same day, was declared the dividend involved here, by the resolution following:

"Whereas, This corporation has sold to The Quaker Oats Company all of its property and assets except cash on hand and its claim or claims against the United States Government for a refund of taxes, and this corporation has agreed to liquidate its affairs and to dissolve; and

"Whereas, it is estimated that the sum paid by The Quaker Oats Company for the properties and assets of the corporation, together with cash on hand and other assets, will be sufficient to pay all holders of the non par value common stock of the corporation, not less than eighty dollars ($80.00) per share; and

"Whereas, the Board of Directors of the corporation have called a meeting of its stockholders, to be held between the hours of ten o'clock A. M. and three o'clock P. M., on Friday, the 15th day of January, 1926, to convene at ten o'clock A. M., to consider the question of the final dissolution of the corporation and the distribution of its cash and the proceeds derived from its property and assets, after the payment of its debts, to its stockholders; and

"Whereas, the corporation now has on hand an earned surplus and undivided profits sufficient to distribute therefrom to each share of said non par value common stock the sum of twenty-five dollars ($25.00); and

"Whereas, the Board of Directors in their judgment deem it advisable and most for the benefit of the corporation that such distribution should be made as a part payment of the total sum to be paid to the holders of such stock by reason of the sale of the properties and assets of the corporation to The Quaker Oats Company and the dissolution of the corporation.

"Therefore, Resolved, that the corporation distribute to the holders of its non par value common stock from its earned surplus the sum of twenty-five dollars ($25.00) per share for each and every share thereof, upon condition, however, that such distribution shall constitute a part of the payment to be made to the holders of the non par value common stock of the corporation by reason of the sale of its properties and assets to The Quaker Oats Company and the dissolution of the corporation.

"Resolved, Further, that the President and Secretary of the corporation prepare and mail to each and every holder of the non par value common stock of the corporation, at his or her last known place of residence a written or printed notice, advising them of the distribution to be made to the holders of such stock, and requesting such stockholders to forward their stock to the corporation or to some bank or agent in the City of St. Joseph, Missouri, in order that proper endorsement may be made thereon, when payment is made.

"Resolved, Further, that all payments made to the stockholders by virtue hereof shall be a part of the total amount to be paid to such stockholders by reason of the sale of the properties and assets of the corporation, from which, together with cash on hand and the proceeds from other assets of the corporation, it is estimated that the holders of non par value common stock will ultimately receive not less than eighty dollars ($80.00) per share for each and every share of such stock, and that no payment shall be made to any person or persons except stockholders of record at the time or times payments are actually made, and, unless and until the certificate or certificates evidencing such stock ownership shall be presented to the corporation, in order that proper endorsement of such payment or payments may be made thereon.

"Resolved, Further, that the President and Secretary of the corporation be, and they hereby are authorized and directed to pay, or cause to be paid, to the holders of the non par value common stock of the corporation, from its earned surplus, the sum of twenty-five dollars ($25.00) per share, by reason of the distribution hereby ordered, when and not until the certificate or certificates evidencing such stock shall be presented to the corporation and endorsed as follows:

" 'There has been paid upon this certificate the sum of twenty-five dollars ($25.00) for each and every share of non par value common stock of Aunt Jemima Mills Company evidenced by such certificate, pursuant to a distribution ordered by the Board of Directors of said corporation on the 15th day of December, 1925, said distribution being a part of the total sum to be paid to the holders of common stock by reason of the sale of the corporation's properties and assets to The Quaker Oats Company and the final dissolution of the corporation.

" 'Aunt Jemima Mills Company,
" 'By ———— Secretary
" '————— Treasurer.' "

Each of these petitioners was paid the dividend, and the above indorsement was made upon his certificates of stock.

At the stockholders' meeting on January 15, 1926, a resolution was passed providing for and authorizing the directors and officers to proceed to dissolve the corporation and distribute the assets. On the same day, the directors declared a "liquidation dividend" of $50 per share paid "as soon as the certificate of the dissolution of the corporation shall be issued by the State of Delaware and the balance due to the corporation by the Quaker Oats Company shall have been paid; provided, however, that no payment shall be made upon any certificate of stock until such stock shall be presented at the office of the corporation in St. Joseph, Missouri, and until there shall be endorsed thereon the following certificate of payment, to-wit:

" 'There has been paid on this date, upon each and every share of stock evidenced by this certificate the sum of fifty dollars ($50.-00) as a liquidation dividend.

" 'Dated at St. Joseph, Missouri, this ———— day of 1926.
" '————————
" 'Secretary.
" '————————
" 'Treasurer.' "

Further liquidating dividends were authorized on June 1, 1926, of $3.50, on June 15, 1927, of $6.70, and on December 19, 1929, of $.052 per share.

█ █ Petitioners present their argument under four headings with various subheadings.

The first heading is that the stipulated facts compel the conclusion that this was an ordinary dividend because the directors had and exercised the discretion (without fraud) to declare this dividend from surplus and profits without impairment of capital, and because the dividend was so declared under compulsion of the Revenue Act of 1926 (section 220 [26 USCA § 961 note] and Regulation 69, articles 353, 1545).

As to the first reason, two matters are destructive. The first is that the dividend was, as a matter of fact, not paid and could not have been paid from surplus and/or earnings. At the time this dividend was declared, the entire property of the corporation had been sold, under authorization of the stockholders, except the cash on hand and a claim for tax refund. The contract of sale required the distribution of all assets to the stockholders and the dissolution or mere nominal existence of the corporation. This sale was on the basis of the balance sheet of October 31, 1925, which showed only $146,330.19 cash on hand while this dividend would require $831,825 to make payment on the outstanding common stock. While the balance sheet shows combined surplus and earnings of $870,176 (including the above cash on hand), it is clear that all thereof except the cash on hand was invested in property which passed to the purchaser. Without the initial purchase payment of $2,000,000 there would have been no funds to meet this dividend. Petitioners contend that: "The mere fact that a sale of assets in which the surplus was in part temporarily invested produced the cash from which the dividend was paid does not indicate a liquidation of capital."

It is difficult to see how a part of a total price for all assets (which happen to include property bought with surplus and earnings) can be segregated and called "surplus" or "earnings." It is purchase price and nothing else.

The second difficulty with this position of petitioners is that the dividend was clearly intended by the directors to be a partial liquidation. It is true that the resolution speaks of having "on hand an earned surplus and undivided profits sufficient to distribute therefrom to each share * * * the sum of twenty-five dollars," and declares the distribution to be "from its earned surplus." However, the resolution itself sets out that the corporation has sold all of its property (except cash on hand and its tax refund claim), "and this corporation has agreed to liquidate its affairs and to dissolve;" that it is estimated that the purchase price, with cash on hand and other assets, will pay not less than $80 per share; that a call has been made for a stockholders' meeting to act upon dissolution and final distribution; that the directors deem it advisable that the distribution of this dividend be made "as a part payment of the total sum to be paid to the holders of such stock by reason of the sale of the properties and assets of the corporation to The Quaker Oats Company and the dissolution of the corporation"; that "all payments made to the stockholders by virtue hereof shall be a part of the total amount to be paid to such stockholders by reason of the sale of the properties and assets of the corporation, from which, together with cash on hand and the proceeds from other assets of the corporation, it is estimated that the holders of non par value common stock will ultimately receive not less than eighty dollars ($80.00) per share for each and every share of such stock;" and that no payment shall be made of this dividend until the stock certificate shall be indorsed with an indorsement stating that this distribution is "a part of the total sum to be paid to the holders of common stock by reason of the sale of the corporation's properties and assets to The Quaker Oats Company and the final dissolution of the corporation."

In short, while the "distribution" was to be made from "earned surplus," it was very clearly stated that it was made as a partial distribution in view of dissolution, and could not be received, unless accepted upon that basis. There is no need to go beyond the terms of the resolution which made this distribution in order to determine conclusively the character of the distribution. If such were necessary, every attendant and surrounding circumstance would speak the same thought. Here was a corporation which had sold its entire assets and business, and, as securing such result to the purchaser, had agreed to dissolve within a year. It had no further business except settlement of its tax refund claim, dissolution, and distribution. All of this had been sanctioned by the stockholders. The sale had been consummated, the property delivered, or in course of delivery, almost half of the purchase price paid and accepted, and a meeting of stockholders called to comply with the contract requirement of dissolution. At the time this distribution was provided for, the corporation was an existing but not, in reality, a going business concern. The only business for which it existed had entirely ceased, and it was obligated not to engage therein further.

580

■ As to the reason that the dividend was compelled by the provisions of the act (section 220) and the departmental regulations: It may be that it was apprehension of the application of this section and these regulations which induced this distribution. That, however, does not determine the character of the distribution. Such character must be gathered from what was actually done.

■ The second heading of the argument is that this could not logically be treated as a distribution in liquidation, "since no corporate action for dissolution had been taken." It is contended that a corporation cannot be "in dissolution" until after corporate action to that end by a stockholders' meeting properly convened. Without close examination, and solely for the purpose of this controversy, it might be conceded that a corporation is not "in dissolution" until proper action therefor has been taken as required by the governing law. This does not help petitioners. Whatever complaint, if any, the state of Delaware or interested creditors might have made is not of concern here. The question here is not what the corporation could do but what it did. It may or may not be that the corporation could not legally distribute its assets until after it had complied with certain requirements of its parent state, but it did do that very thing, and when it did so it created the situation to which the national taxing statute directly applied. These petitioners accepted and could have obtained this distribution dividend only upon condition that it was such. They cannot now be heard to claim that the corporation had no right to make such character of distribution; that it is not, therefore, of such character, and thus escape the applicable tax while they retain the dividend.

■ The third contention is that section 201 of the act (26 USCA § 932), properly construed, cannot apply to this situation because the section applies only to "actual distribution of capital" while this dividend was only of a part "of surplus earnings." The section carries its own definition. It reads: "Amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock" (section 201 (c), and "amounts distributed in partial liquidation" is defined as meaning "a distribution by a corporation in complete cancellation or redemption of a part of its stock, or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock" (section 201 (h). Was this dividend "one of a series of dis-

tributions in complete cancellation or redemption of all * * * of its stock?"

The directors had estimated to the stockholders that the contemplated sale (under a submitted offer) would result in "at least eighty dollars ($80.00) per share for the outstanding common stock." The stockholders had authorized the sale under a contract requiring dissolution within a year and distribution. The contract had been made. The property delivered or in course of delivery. Nearly half of the purchase price received and accepted. A stockholders' meeting to carry out the contract required dissolution, and distribution had been called. The dividend (called "distribution" in the resolution declaring it) had been ordered "as a part payment of the total sum to be paid to the holders of such stock by reason of the sale of the properties and assets of the corporation to The Quaker Oats Company and the dissolution of the corporation." It was an express condition that no payment of the dividend be made to any stockholder "until" his certificate of stock be indorsed that such payment was "a part of the total sum to be paid to the holders of common stock by reason of the sale of the corporation's properties and assets to The Quaker Oats Company and the final dissolution of the corporation." By far the larger part of this dividend had to be and was paid from a payment on the purchase price. The stockholders' meeting was held and authorized complete dissolution and distribution. Subsequent "liquidation" dividends were declared which, with this dividend, totaled $85.252 per share. When the next to the last dividend was paid, it was conditioned "upon the delivery of common stock certificates to be retained" by the directors, and the last dividend was "payable at once to stockholders who have surrendered their certificates, and payable to those who have not surrendered their certificates, upon receipt of the certificates, which certificates will be retained by us."

From this outline, it must be clear that this dividend was never intended, nor understood to be, nor could be other than, "one of a series of distributions in complete cancellation or redemption of all * * * of its stock." This is not an instance of doubtful application of the statute nor is the urged analogy of the application of dividends as between life tenant and remainderman useful.

The final contention is that the Board of Tax Appeals and the departmental regulations and rulings have uniformly construed

similar dividends to be not in liquidation, and that much weight should be accorded this "practical construction of a statute by officers or Departments whose duty it is to enforce it." Without determining here whether the construction contended for has been that of the Board of Tax Appeals or of the administrative officers, it is enough to say that we entertain no doubt concerning the construction to be placed upon the provisions, here involved, of the statute.

The petitions for review must be dismissed.