Hugh H. EARLE, Former Collector of Internal Revenue, Appellant,

v.

Angela MacEvoy WOODLAW et al., Appellees.

No. 15062.

United States Court of Appeals
Ninth Circuit.

Feb. 28, 1957.

Rehearing Denied April 10, 1957.

Writ of Certiorari Denied June 24, 1957.
See 77 S.Ct. 1400.

Charles K. Rice, Asst. Atty. Gen., C. E. Luckey, U. S. Atty., Victor E. Harr, Portland, Or., Lee A. Jackson, A. F. Prescott, Louise Foster, Feather & Fong, Washington, D. C., for appellant.

George W. Mead and Stephen W. Matthieu, Portland, Or., for appellees.

Before FEE and BARNES, Circuit Judges, and MURRAY, District Judge.

BARNES, Circuit Judge.

The former District Collector of Internal Revenue for Oregon appeals from a judgment of the District Court awarding appellees (Executors of the estate of G. T. Woodlaw, deceased) the sum of $153,550.92 for the year 1946; $1,162.-67 for the year 1947; and $31,688.38 for the year 1949, together with interest and costs, which sums constitute claims for refund of taxes paid because of deficiencies assessed against taxpayer—decedent, G. T. Woodlaw, for the years mentioned.

The deficiencies were claimed in each year because the Government asserted that certain payments made by the Oregon corporation, Woodlaw Investment Company, to the taxpayer G. T. Woodlaw as sole stockholder (save for qualifying shares) 1, in connection with the purchase and retirement of one-half of the corporation's outstanding stock, were distributions essentially equivalent to a taxable dividend, within the meaning of Section 115(g) of the Internal Revenue Code of 1939. The deficiencies had been paid with interest, and timely claims for refund subsequently filed.

Taxpayer and appellees had maintained the payments in question were a distribution of capital assets, and paid taxes on that basis. The trial court so found, (Finding XIX, Tr. 50) and as well, that there existed a legitimate business purpose for the sale of stock in 1946, and that Section 115(g) of the Revenue Act was inapplicable, (Finding XX, Tr. 50). Appellants urge there is no evidence in the record to support either of such Findings, and further, that the District Court erred in holding that a $40,225.15 debt, owed by G. T. Woodlaw to the corporation, and written off by the corporation as part of the claimed distribution, was not taxable as ordinary income.

Section 115 of the Internal Revenue Code of 1939 reads in part as follows: [1]

---

I. Other material portions of Section 115 are:
"(a) [as amended by Secs. 166 and 186 (a) of the Revenue Act of 1942, c. 619, 56 Stat. 798] Definition of dividend. The term 'dividend' when used in this chapter (except in section 201(c) (5), section 204 (c) (11) and section 207(a) (2) and

(b) (3) (where the reference is to dividends of insurance companies paid to policy holders)) means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable

"(c) [as amended by Sec. 147 of the Revenue Act of 1942 supra] Distributions in liquidation. Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. The gain or loss to the distributee resulting from such exchange shall be determined under section 111, but shall be recognized only to the extent provided in section 112. In the case of amounts distributed (whether before January 1, 1939, or on or after such date) in partial liquidation (other than a distribution to which the provisions of subsection (h) of this section are applicable) the part of such distribution which is properly chargeable to capital account shall not be considered a distribution of earnings or profits. * * *

\* \* \* \* \* \*

"(g) Redemption of stock. If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.

\* \* \* \* \* \*

"(i) Definition of partial liquidation. As used in this section the term 'amounts distributed in partial liquidation' means a distribution by a corporation in complete cancellation or redemption of a part of its stock, or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock." 26 U.S.C. 1952 ed., § 115.[2]

■■ As both sides must, and do, recognize

"The question whether a distribution in connection with a cancellation or redemption of stock is essentially equivalent to the distribution of a taxable dividend depends upon the circumstances of each case. A cancellation or redemption by a corporation of a portion of its stock pro rata among all the shareholders will generally be considered as effecting a distribution essentially equivalent to a dividend distribution to the extent of the earnings and profits accumulated after February 28, 1913. On the other hand, a cancellation or redemption by a corporation of all of the stock of a particular shareholder, so that the shareholder ceases to be interested in the affairs of the corporation, does not effect a distribution of a taxable dividend. A bona fide distribution in complete cancellation or redemption of all of the stock of a corporation, or one of a series of bona fide distributions in complete cancellation or redemption of all of the stock of a corporation, is not essentially equivalent to the distribution of a taxable dividend. If a distribution is made pursuant to a corporate resolution reciting that the distribution is made in liquidation of the cor-

---

year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. * * *

"(b) Source of distributions. For the purposes of this chapter every distribution is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings or profits. \* \* \* "

2. Treasury Regulations 111, promulgated under the Internal Revenue Code of 1939:
"Sec. 29.115–9. Distribution in Redemption or Cancellation or Stock Taxable as a Dividend.—If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in whole or in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend.

"the question of whether a particular corporate distribution is a liquidating dividend within the meaning of Section 115(c), or is essentially equivalent to an ordinary dividend within the purview of Section 115(g) is a question of fact and depends upon the circumstances of each case." (Appellant's Brief, p. 13.)

"Each case under this section of the code must be determined upon its own facts." (Appellee's Brief, p. 25.)

And, they agree, the ultimate conclusion reached by the trial court on such a factual question can be reversed only when "clearly erroneous."

We first note that Findings of Fact XIX and XX are, by their terms, in part combined Findings of Fact and Conclusions of Law. That the transaction detailed in this case was "not a transaction equivalent to the distribution of a taxable dividend within the meaning of Section 115 (g) of the Internal Revenue Code" and that "the net effect of the distribution to the said G. T. Woodlaw was a distribution of capital assets" are at best combined findings of fact and conclusions of law, if not purely conclusions of law. Cf. Thornley v. C. I. R., 3 Cir., 147 F.2d 416. The same must be said of the last part of Finding XX; that "there was in existence * * * in 1946 * * * a legitimate business purpose" for the sale of the stock by G. T. Woodlaw to the corporation, "and Section 115(g) of the Revenue Act is inapplicable."

This last finding raises the inference that the District Court found that Section 115(g) of the Revenue Act was inapplicable *because* it found that there was a legitimate business purpose for the distributions. If this inference be that it was the legitimate business purpose *of the corporation,* and not of Woodlaw personally, we can find no support for it in the evidence.

Section 115(g) is not a complicated law vis a vis the facts of this case. Here there was a cancellation or redemption [3] of one-half of its outstanding stock by the Woodlaw Investment Company.[4]

Was the redemption "at such time and in such manner" as to make it in whole or in part essentially equivalent to the distribution of a taxable dividend? If so, to the extent it represents a distribution of earnings or profits accumulated after February 28, 1913, the law requires that it be treated as a taxable dividend.

What facts did the District Court have before it, which this court must consider in coming to its conclusion as to whether the trial court's findings of fact are clearly erroneous?

In this case, the record is short, (forty-six pages of oral testimony) and the facts relatively simple. Colonel G. T. Woodlaw had died before the trial. His widow, his lawyer, and five business associates testified on behalf of his estate.

The Colonel was a rugged individualist, with forceful ideas, and strong convictions. A man of "dominant disposition,"—"He handled his own affairs and fought his own battles." His will, in evidence, (Defendant's Ex. 1) proves that well. In 1946, when the purchase

poration, and the corporation is completely liquidated and dissolved within one year after the distribution, the distribution will not be considered essentially equivalent to the distribution of a taxable dividend; in all other cases the facts and circumstances should be reported to the Commissioner for his determination whether the distribution, or any part thereof, is essentially equivalent to the distribution of a taxable dividend."

3. We make no distinction between stock cancelled and retired; and stock redeemed but held by the corporation as unissued stock. Boyle v. C. I. R., 3 Cir., 187 F.2d 557, certiorari denied 342 U.S. 817, 72 S. Ct. 31, 96 L.Ed. 618.

4. We will, throughout this opinion 1, omit reference to the qualifying shares, and consider G. T. Woodlaw to have been the holder of all outstanding stock, both before and after the redemption in question. Cf. Christopher v. Burnett, 60 App. D.C. 365, 55 F.2d 527; Hirsch v. Commissioner, 9 Cir., 124 F.2d 24.

by the corporation of one-half of Colonel Woodlaw's stock took place, he was eighty years of age. He had been shaken by the death, in an airplane accident on November 29th, 1945, of his grandson, Graham Castel Woodlaw, the Colonel's adopted son, and his "heir-apparent." The Colonel believed "the sun rose and set in him." (Tr. 116.) The youth's death without question left Colonel Woodlaw a heart-broken old man.

Mr. Gamble, the first witness, had purchased the stock of the Circle Theatre Company, a corporation, from Colonel Woodlaw, as of May 5, 1947. This Company *operated* the Circle Theatre, *renting* from the Woodlaw Investment Company, who held title to the theatre building. In the contract of purchase, the Gambles, (for Mrs. Gamble also signed the contract) were assured that the seller, Colonel Woodlaw, would secure for them an eight year lease of the premises, at a rental of $300 per week, with an option to the Gambles for another fifteen years, and a second option for a further ten year period. Thus, the Contract of Purchase (Plaintiff's Ex. 6) obligated the Woodlaw Investment Company, or its assignee, some number of years into the future, i. e., until 1979. The Gamble contract also provided that

> "any rentals that may hereafter accrue to the Circle Theatre Co. by reason of existing leases or as monthly rental from any portion of the Circle Theatre Bldg., other than the Theatre itself, shall be assigned * * * to the Woodlaw Investment Company, * * *."
> (Plaintiff's Ex. 12, p. 3.)

Witness Gamble made his purchase of Circle Theatre stock from Colonel Woodlaw, not from the Woodlaw Investment Company. He made it after the date of purchase by the Company of one-half of the Colonel's stock. The Colonel discussed with Gamble, in 1947 his desire "to liquidate *his* assets", (Tr. 59) and get "*his* affairs" in shape; that he had set up a considerable sum of cash in the United States National Bank

and "wanted to proceed with it." (Tr. 60.) This was "because of his age, and the fact he wanted to get his affairs in shape so his widow would have no difficulty if something happened to him." (Tr. 60.)

"Q. Did that (the proceeding with the liquidation of his affairs) include the physical property of the Woodlaw Investment Company, * * * ? A. He didn't go into details with me * * *." (Tr. 60.)

Likewise, the witness Riley had conversations with the Colonel in 1946 or '47 or '48, relative to "*his* holdings". (Tr. 63.)

"I could not identify whether it was Woodlaw Investment Company or Colonel Woodlaw. It was his holdings, yes." (Tr. 63.)

Witness Rogoway leased the Fourth Avenue Hotel, in 1946, from the Woodlaw Investment Company. The precise term of the lease is not in evidence, but after an extension had been given, it "expired December 31, 1956." (Tr. 108.)

In 1947, the same witness was offered the opportunity to purchase the Fourth Avenue Hotel property, the Circle Theatre and the Maguire Bldg. (Tr. 68) for one million dollars, "the stipulated figure." Rogoway "told some of his friends and associates," but "it amounted up to quite a sum of money." The Colonel thereafter discussed the possibility of liquidating right up to the time of his death. "He told me he had done his bit of work, and he was getting old, and he would like to kind of take a back seat for a while." (Tr. 69.)

The witness Childs, when he heard the Colonel was interested in liquidating his assets, brought the Colonel together with a Mr. Caraplis, in 1948. The three had lunch at the Golden Pheasant, and "discussed the buildings, the revenue and the price."

"Q. Nothing ever came of that situation? A. Not that I know of." (Tr. 73.)

Mr. Matthieu, the Colonel's attorney, never knew of any negotiations with Caraplis, (Tr. 109); he knew of negotiations with Rogoway; he did not know of any other negotiations for sale of any properties with any other people. (Tr. 109, 110.) The property was not listed for sale with any real estate firms, because, we may infer, of the Colonel's antipathy toward them. (Tr. 110.)

The Colonel's attorney, Mr. Matthieu, testified the Colonel redrew his will in December 1945, after the boy's death. (Tr. 82.) No testimony was introduced as to the contents of that will. This witness testified to the following "steps" in the plan to liquidate the Woodlaw Investment Co.:

1. Sale of vacant lot in February 1946 for $2,200.

2. Sale of vacant Failing Street property in April 1946 for $9,000.

3. Sale of Hamilton Building, May 29th, 1946 for $80,000.

4. Sale of Circle Theatre stock, as of May 5, 1947. [It is difficult to see how the sale of this stock, of a separate corporation, was part of the *corporation's* plan to dispose of its holdings. It is obvious that the sale of the stock was part of the Colonel's plan to sell his holdings, (Cf. Tr. 107, 108) and escape managerial responsibility. The explanation proffered as to corporate benefit was that a long term leasehold made the fee attractive to possible buyers from the corporation. (Tr. 108.)

Meanwhile, in October of 1945, *before the death of his son,* and *before any plan to liquidate the corporation,* the corporation had sold the Gerlinger Building.

"Q. When was that building sold? A. That was in October, 1945." (Tr. 104.) (October 12, 1945; Pretrial Order, Para. XV; Tr. 33.)

"Q. When would you fix the time, Mr. Matthieu, that he formulated the plan of liquidating all of the assets of the Woodlaw Invest-

ment Company that have been described? A. I would say in December of 1945."

The terms of the Gerlinger Building sale are undisclosed in the evidence. (Plaintiff's Ex. 12.)

Mrs. Woodlaw testified, briefly, that her husband "desired to unload". (Tr. 115.) In response to a leading question, she testified the Gerlinger Building sale, in 1945, was the result, of a conclusion

"that the corporation would not expand its activities, but would contract them."

She inferentially contradicted this testimony almost immediately by stating that it was the death of the grandson that gave Colonel Woodlaw the desire to contract the corporate activities.

She knew "what was going on", but nothing of any attempts to sell the principal properties, save the one contact with Mr. Caraplis, and the "negotiations" as testified to by Mr. Rogoway.

We next turn to the Exhibits in evidence. Plaintiff's Exhibit 5, the Hamilton Building "sale", is worthy of comment.

The price was $80,000, payable $10,000 down and the balance payable in monthly installments of $518.00 per month,

"which monthly installments shall include interest at the rate of 4% per annum on the unpaid balance * * *."

By the agreement, title did not pass until payments were fully made, although the seller agreed it would pass title after the principal sum due had been decreased to $40,000, upon demand of purchaser.

Rough calculations indicate that a dozen years or so would be required before title could pass in any event, and more than that before the purchase price would be fully paid. This certainly is not the type of contract that one would usually find being entered into by a corporation planning an orderly liquida-

125

tion of its assets. The minutes of the special meeting of the Directors, held on April 30, 1946, at which this agreement for sale was authorized, contain nothing to aid us in determining why it was to be made. (Plaintiff's Ex. 11.)

Another Exhibit deserves comment. Plaintiff's Exhibit 15 is a copy of the Minutes of the Special Joint Meeting of Stockholders and Directors of Woodlaw Investment Company, held February 9, 1946, to consider the retirement of 1400 shares of stock of the corporation. The minutes list those present. It was then:

"Resolved, that the corporation purchase 1400 shares of the Woodlaw Investment Company stock at $190.00 per share, and this stock be retired by the Corporation; that the President, G. T. Woodlaw, be instructed to purchase these shares on behalf of the Corporation."

The meeting then adjourned. The minutes show no discussion of the matter; no reference to any plan of contraction; no reference to any general business conditions or factors which might influence the director's decision; no indication of why or how the figure of $190.-00 per share was arrived at;[5] no indication of any advantage to be gained by the corporation in taking this action.

Nothing contained in the Minutes of the January 25, 1946 meeting, (approving of the President's previous decision and contract to sell the Gerlinger Building) or the Minutes of February 5, 1946, (authorizing the officers to reduce the Capital Stock from 3500 shares of common to 2800 shares of common) gives any hint of why such actions were taken, nor what benefit could arise for the corporation, nor for that matter, for anyone else.

It is true that this undoubtedly was completely a one man corporation; that, as Mr. Matthieu testified:

"When I say 'he' I mean the Woodlaw Investment Company in many instances." (Tr. 104.)

Nevertheless, we still must seek to find a corporate purpose, rather than a shareholder's purpose.

It is easy to understand that the minutes may not have been kept as fully, or as accurately, as though minority stockholders or representatives of other interests existed, who might one day be concerned with their contents. They are mentioned to point out they add nothing to the appellee's position, and gave the trial judge no help in coming to the conclusion which he did, and which is here challenged.

Another document in evidence is the last Will and Testament of G. T. Woodlaw. (Defendant's Ex. 1.) It was dated December 30th, 1948. If the testator had any idea of dissolving the corporation in 1946, he must have given it up before he wrote his Will in 1948. (The Colonel had executed a new Will in December of 1945. It may or may not have aided the trier of fact here, but it was not introduced in evidence.) The 1948 Will read, (paragraph six) in part:

"I believe I have my affairs in such order that my estate will have sufficient funds to pay such (inheritance) taxes without disposing of any of my stock in the Woodlawn Investment Company. However, if * * * my estate does not have sufficient funds to pay such taxes, then * * * I direct * * * my Executors to borrow from the Woodlaw Investment Company an amount sufficient (to pay taxes) and any amount so borrowed shall be paid back to said Woodlaw Investment Company in annual installments over the period of 15 years of the trust hereinafter set up, and at such interest rate as my executors and trustees may

5. The stock was appraised at the date of death at $360.71 per share; based on a total value of $504,994.00. Compare this with the "stipulated price" of $1,000,000 asked for its principal asset.

agree with the Woodlaw Investment Company."

The testator then created a fifteen year trust from the date of his death; (a) "of all the outstanding stock of the Woodlaw Investment Company"; plus (b) any indebtedness of the Woodlaw Investment Company owed to him ($97,000 when the Will was executed); plus (c) any sums left over, after inheritance taxes, from the $145,000 in Government bonds he held at the time of execution of the Will.

His Will provided for a division of the stock of Woodlaw Investment Company fifteen years after his death:

| | | |
|---|---|---|
| 400 Shares | to his son, Robert Thornton Woodlaw | |
| 701 " | to his wife, Angela | |
| 115 " | to charity | |
| 125 " | to relatives | |
| 59 " | to friends | |

The trustees were authorized to operate the Woodlaw Investment Company during the period of the trust.

Before we consider the law applicable to the facts of this instant case, we must first recognize that "most of [the cases arising under Sec. 115(g)] are of little value in the determination of the question instantly presented, for the reason that each depends for its solution upon its own peculiar facts." McGuire v. Commissioner, 7 Cir., 84 F. 2d 431, 432; Hirsch v. Commissioner, 9 Cir., 124 F.2d 24; Bazley v. C. I. R., 3 Cir., 155 F.2d 237, affirmed, 331 U.S. 737, 67 S.Ct. 1489, 91 L.Ed. 1782, 1783. "In determining whether a transaction is equivalent to a taxable dividend under § 115(g), or whether it is a partial liquidation within § 115(c), neither the Board of Tax Appeals nor the courts have laid down a sole decisive test." Flanagan v. Helvering, 73 App.D.C. 46, 116 F.2d 937, 939.

The cases do, however, lay down certain "judicial criteria," as Judge Vinson described them in the Flanagan case, which have proven useful in coming to a conclusion as to whether Sec. 115(g) is applicable. These are: ·

1. Did the corporation adopt any plan or policy of contraction of its business activities?

2. Did the corporation follow an orderly procedure looking toward its ultimate dissolution, or its ultimate contracted operation?

3. Did the initiative for the corporate distribution come from the corporation, based on usual business considerations, or did it come from stockholders, (or a stockholder), for their (or his) own purpose?

4. Is the proportionate ownership of stock by the shareholders changed?

5. What were the amounts, the frequency and the significance of dividends paid in the past?

6. Does the capitalization, at the time of cancellation of the stock, represent capital paid in, or earnings from the business?

7. Was there a sufficient accumulation of earned surplus to cover the distribution, or was it partly from capital?

8. Was there a maintenance of a relatively similar amount of capital liability, or did that figure decrease to a degree somewhat comparable to the purported distribution of capital?

9. Was there good faith, or bad, in the action of the Board of Directors?

10. What was the net effect of actions taken?

This last criteria is that of most importance.

We shall discuss each of these guide posts in turn.

I. Did the corporation adopt any plan or policy of contraction of its business activities?

Here there exists no satisfactory credible evidence that any plan or policy of contraction was ever adopted *by the corporation*. The usual *place* to find such a policy expressed is in the corporate minutes. No such expression exists here. The best *proof* is in the conduct of the corporate affairs in the period subsequent to the alleged date of

adoption of the plan. Here the corporation continues to operate, financially as healthy as ever, nine years after the claimed decision to contract. It continued to operate 90%, in value, of its properties. It increased the value of its shares between 1946 and the death of its chief stockholder from $190 to $360 per share.

The stock, valued at approximately one-half million for inheritance purposes, represented primarily the ownership of three apparently contiguous pieces of real property; the Fourth Avenue Hotel, the Circle Theatre and the Maguire Building. Feeble attempts were made to sell that property for a "stipulated" one million dollars. Sales of two unimproved parcels of realty produced $11,200. The Hamilton Building sale produced $10,000 cash and a $70,000 paper obligation extending over a long term. This is scant evidence of any real purpose to "contract" the corporate operations of Woodlaw Investment Company. We refer herein to evidence that indicates that such plan or policy, if it ever existed, did so for no substantial length of time.

II. Did the corporation follow an orderly procedure looking toward its ultimate dissolution, or its ultimate contracted operation?

The answer here is obviously that it did not; or at least no evidence thereof is before us. Rheinstrom v. Conner, 6 Cir., 125 F.2d 790, certiorari denied 317 U.S. 654, 63 S.Ct. 49, 87 L.Ed. 526.

The corporation did continue to operate, and at a profit. Flanagan v. Helvering, supra.

III. Did the initiative for the corporate distribution come from the corporation, based on usual business considerations, or did it come from the stockholders, (or stockholder), for their, (or his), own purpose?

Here clearly, the cases which rest on plans for corporate reorganization, or corporate lack of capital, or excessive amounts of capital, are all beside the point. Here the sole stockholder was tired of his role as a business man; his tiredness was accentuated by the unexpected death of his adopted son. But these were *his* reasons for letting go the helm, not the usual corporate considerations.

If we are to assume that the unexpressed corporate intent or purpose can be inferred from the only stockholder's intent and purpose to "liquidate his holdings," whether in 1945, before his grandson's death, or in 1946 after it, or even in 1947 when the "one million dollar" proposition was discussed, certainly sometime before his second Will was drawn in 1948, he (Woodlaw) had no further intent to liquidate the Woodlaw Investment Company. That is best proved, first, by the provisions of his Will, and more emphatically, by the fact "the Woodlaw Investment Company has continued in existence since 1946 in the same type of business from that date up to and including the present time." (October 18, 1955; Additional Finding of Fact, III; Tr. 129.)

IV. Is proportionate ownership of stock by shareholders changed?

The answer is, of course, that it was not. The materiality of this factor is well expressed in many cases. See particularly, Flanagan v. Helvering, supra.

V. What were the amounts, the frequency, and the significance of dividends paid in the past?

Here the corporation paid dividends in but two years of its existence—1938 and 1939. (Additional Finding of Fact II; Tr. 128, 129.)

In 1938 it had operated at a loss. Starting in 1920 with a capital of $200,000, it increased that capital in 1923 to $250,000, and in 1929 to $350,000. (Plaintiff's Ex. 27.) It had in 1929 an "Earned Surplus and Undivided Profits" of $114,000. That surplus went up and down, but was $146,000 in 1939. It went up to $286,000 in 1945. Altho it was reduced by the $163,000 cash paid to Colonel Woodlaw in 1946, (and perhaps by the cancellation of his loan account of $40,000 in the same

year), it had grown back to $270,000 in 1949. (Additional Finding, II.)

It seems obvious that the sole stockholder, for his own convenience, failed to have the corporation pay dividends during the long period of years when the corporation, "based on usual business considerations," would ordinarily have done so. This seems to meet the indicia discussed in Commissioner of Internal Revenue v. Roberts, 4 Cir., 203 F.2d 304, where there was a finding that there had been accumulations by the corporation for no definite corporate purpose, that there was on hand "a large and unnecessary accumulation of cash, representing earnings." Commissioner of Internal Revenue v. Roberts, supra, 203 F.2d at pages 306, 307.

VI. Does the capitalization, at the time of the cancellation of the stock, represent capital paid in, or earnings?

There is no testimony as to where the funds came from to account for the two increases in capitalization in 1923 and 1929.

VII. Was there a sufficient amount of earned surplus to cover the distribution, or was it partly capital?

The record is clear on this issue, that the distribution was from accumulated net income classified as "Earned Surplus and Undivided Profits, on the books of the corporation." (Additional Finding of Fact II; Tr. 129.)

Where there was on hand undistributed surplus five times as large as par value of stock, and earnings in one year three times the amount distributed thru retirement, money paid was dividend subject to income taxes, under facts of case, despite the fact the entire class of preferred stock was retired. Goldstein v. C. I. R., 7 Cir., 113 F.2d 363.

Where a corporation in good years increased capital by stock dividends, and reduced capital when capital requirements were reduced in subsequent years, distribution was not taxable as dividends. Dana v. Sheehan, 8 Cir., 163 F.2d 316, 173 A.L.R. 684.

Distributions by a corporation are taxable "dividends" only so far as derived from earnings and surplus, and are not taxable to the extent they represent a return of capital investment. Jones v. Dawson, 10 Cir., 148 F.2d 87.

III. Was there a maintenance of a relatively similar amount of capital liability, or did that figure decrease to a degree somewhat comparable to the purported distribution of capital?

Here there was decrease of capital liability from $350,000 to $280,000 on March 5, 1946.

But the significance of this decrease is small, in view of the continuing surplus, and its continued increase.

Where par value of shares was reduced one-half and capital was reduced one-half by payment to common stockholders, and there were sufficient earnings and profits accumulated by a bank over the years to cover the distribution, it was a "dividend" for income tax purposes, notwithstanding the fact that the bank did not declare a dividend; and had no intention to do so. Dunton v. Clauson, D.C., 67 F.Supp. 839.

A reduction of par value of stock by $2.00 per share, and distribution of reduction from surplus, without intent to wind up affairs or curtail business, was a taxable "dividend". Wilcox v. C. I. R., 9 Cir., 137 F.2d 136. Cf. Fostoria Glass Co. v. Yoke, D.C., 45 F.Supp. 962.

IX. Was there good faith, or bad, in the action of the Board of Directors?

The question of "good faith" was in earlier cases held important. It is now considered of such little importance that it is practically immaterial. In any event, we need not question the good faith in this case.

The question whether a distribution is "essentially equivalent to the distribution of a taxable dividend" does not depend on presence or absence of honesty in distribution, but the question is one of equivalents, and, if that is present, distribution is taxable. Stein v. United States, 62 F.Supp. 568,

104 Ct.Cl. 446; Hirsch v. C. I. R., supra; Smith v. United States, 3 Cir., 121 F.2d 692.

The good faith or lack of it, leading to the actions taken by the corporate officers is not, as the earlier cases enunciated it, controlling. Hirsch v. Commissioner, supra, 124 F.2d at page 30; refusing to follow; Patty v. Helvering, 2 Cir., 98 F.2d 717; and Commissioner of Internal Revenue v. Quackenbos, 2 Cir., 78 F.2d 156.

Some of the earlier cases, emphasizing that a question of fact is involved, also urge that the intent of the directors of the corporation is to be considered. Tate v. Commissioner, 8 Cir., 97 F.2d 658; Tootle v. Commissioner, 8 Cir., 58 F.2d 576. But later cases place the emphasis on the *effect* of the distribution as that which controls, and not the intent nor the motives, either of the taxpayer or the corporation. Smith v. United States, supra.

"[T]he net effect of the distribution rather than the motives and plans of the taxpayer or his corporation, is the fundamental question in administering § 115(g)." Flanagan v. Helvering, supra [73 App.D.C. 46, 116 F.2d 938].

This brings us to our last, and most important criteria.

X. What was the *net effect* of the actions taken?

If all purchases of its own stock by a corporation taken together, accomplish the same result as the declaration of a dividend, a gain derived by a stockholder therefrom is taxable as a dividend. Trust Company of Georgia v. United States, 60 F.Supp. 470, 104 Ct. Cl. 150.

In Hyman v. Helvering, the petitioners owned 1998 shares of the 2000 shares outstanding. The earned surplus was approximately $100,000. Petitioner sold 1950 shares to the corporation for $195,000. Held, to the extent of the surplus, the purchase of stock was taxable as a dividend under Sec. 115(g). 28 B.T.A. 1231; 63 App.D.C.

221, 71 F.2d 342, certiorari denied 293 U.S. 570, 55 S.Ct. 100, 79 L.Ed. 669.

This case describes the legislative history behind Sec. 115(g), 71 F.2d at page 344:

"Suppose * * * the case of two men holding practically the entire stock of a corporation for which each paid $50,000. The corporation, having accumulated a surplus of $50,000 above its cash capital, buys from the stockholders for cash one-half of the stock held by them and cancels it, and the payment is nontaxable because it is a partial redemption of stock. To change this result and make it taxable (g) was written and incorporated into the law."

House, Senate and Conference Reports. H. Rep. No. 1, 69th Congress, first Session, p. 5; S. Rep. No. 52, 69th Congress, First Session, p. 15; H. Conf. Rep. No. 356, 69th Congress, First Session, p. 30.

In Smith v. United States, supra, the plaintiff formed a personal holding company in 1923, owning all shares, both common and preferred. By 1934, there was accumulated $240,000 in earnings. In that year the plaintiff transferred 880 of his preferred shares to the holding company in exchange for $49,500 in securities of other companies. Later he transferred 435 shares of preferred for $43,500 in mortgages. In 1935 the plaintiff transferred to the corporation 425 shares of preferred for $42,500 cash. The court found (1) that "no justifiable business reason prompted the company's redemption of its stock", (2) that the transfers were "accomplished for the personal advantage and service of the plaintiff", (3) that plaintiff's own equity in the company remained what it had always been, 100%, and (4) that the company continued to operate as before.

"The answer within the intendment of (g) turns not so much upon the question of whether there was or was not liquidation, as upon the result." 121 F.2d at page 695.

The court affirmed that the transactions were taxable as dividends.

In Boyle v. Commissioner of Internal Revenue, 3 Cir., 187 F.2d 557, 560, the Tax Court held there was a *taxable dividend*, on the following facts:

1. "a corporation, with three principal stockholders holding their shares in virtually equal proportions, distributed to them the bulk of its accumulated earnings and that ultimately there remained three shareholders."

2. the company never paid cash dividends,

3. there was no policy of contraction or liquidation,

4. the initiative came from majority stockholders,

5. there was a large earned surplus, and

6. there was an unnecessary accumulation of cash.

Both the earned surplus and cash were reduced "as they would have been by the declaration of a true dividend." Held: Taxable dividend.

The reasons for the existence of Section 115(g) is well expressed in Mertens' Text.

"The basic principle for the taxation of distributions in liquidation, complete or partial, is that they are treated as a sale or exchange, rather than as ordinary dividends; even though the liquidating distributions include earnings and profits. This has been true since the 1924 Act, and probably the 1918 and 1913 Acts." Mertens, Vol. I, Sec. 9.77, p. 52, et seq.

"under the 1916, 1917 and 1921 Acts, the treatment was different: that portion of a distribution in liquidation which represented distribution of earnings or profits accumulated after February 28, 1913 was treated as ordinary dividend, the balance as a reduction of cost * * *." Mertens Law of Federal Income Taxation, Vol. I, p. 528.

Practical problems were raised by the difference in treatment effected by the two viewpoints of the law makers. Total liquidation could not always be accomplished immediately, nor even under the three year and two year limitations of the Acts of 1938 and 1936. Sec. 115(c). This as Mertens says, "provoked considerable controversy," and necessitated partial liquidating dividends.

Prior to 1942, amounts received in partial liquidation of corporate assets were treated as short term capital gains. This was to prevent tax avoidance by distributing ordinary income in the guise of a partial liquidation. But this arbitrary distinction between nontaxable total liquidation and taxable partial liquidation, resulted in inequality in the case of unquestionably bona fide redemptions of stock not equivalent in any way to the distribution of a taxable dividend. The Report of the Ways and Means Committee of the 77th Congress, Report No. 2333, 77th Congress, 2nd Session, P. 93 stated, relative to their proposed solution of the problem—the enactment of Sec. 115(g).

"It is believed that the proper application of Section 115(g) will prove adequate to prevent taxable dividends disguised as liquidations from receiving capital-gains treatment." Mertens' Law of Federal Income Taxation, Sec. 9.78, 1955—Cum Pocket Supp., p. 403.

In view of the law and the facts of this case, we must find the decision of the lower court clearly erroneous.

We think the language used in the last paragraphs of the Roberts case, supra, 203 F.2d at page 307, is particularly apt:

"Any conclusion other than that which we have reached readily shows how easily the tactics of the taxpayer here could be used as a means of tax evasion. A prosperous corporation, for example, with a single stockholder, earns large

sums of money, available for, and which should be paid out as, dividends. This sole stockholder syphons off this money (as was done in the instant case) to himself by selling a portion of his stock to the corporation at a price per share which will just cover these earnings. Surely, this is a redemption 'essentially equivalent to the distribution of a taxable dividend.' Congress must have had just such a situation in mind when it enacted section 115(g). * * * The decision of the Tax Court of the United States is reversed and the case is remanded with directions to enter a decision in favor of the Commissioner."

See also these cases, heretofore referred to: Flanagan v. Helvering; Hirsch v. C. I. R.; Bazley v. C. I. R.; Rheinstrom v. Conner, particularly 125 F.2d at pages 792, 794.

This brings us to appellant's third point, that the debt of $40,225.15 owed by G. T. Woodlaw to the Woodlaw Investment Company and written off by the corporation in the transaction was not taxable as ordinary income to said G. T. Woodlaw in the year of distribution.

This point refers to Finding of Fact XXI which reads:

"That part of the income attributable to the taxpayer arose out of the write-off of $40,225.15 shown due on the books of Woodlaw Investment Co. from decedent, G. T. Woodlaw."

We were inclined to believe this language might be ambiguous in the printed record before us, (Tr. 50). It raises a nice semantic question. If the first two words meant "that *part*", etc., the sentence is complete; if it means *"That part"*, the sentence is incomplete. We have checked the original document, and find the printed Transcript of Record correct. We therefore must interpret it as though the second word is emphasized. The semantic resolution creates substantive problems. It would seem to follow from the finding that the sum should be treated as ordinary income. Yet, the District Court's judgment indicates by implication that it was not so regarded.

Finding XVIII indicates that some decision had been made between the Government and the taxpayer, as to the nontaxability of this item of $40,225.15 many years ago. The Government had apparently determined the moneys lent to Colonel Woodlaw were not dividends realized by the taxpayer, *at that time*.

■ The ordinary rule has been expressed by this Circuit in the Hirsch, case, supra [124 F.2d 29],

"If the stockholder borrows money from the company, and subsequently the company cancels the debt, income accrues to the stockholder at the time when the character of the withdrawal changes from a loan to a distribution of profits."

Quoting with approval, Wiese v. Commissioner, 8 Cir., 93 F.2d 921, 922; Cf. Allen v. Commissioner, 1 Cir., 117 F.2d 364, 368.

In light of our position respecting this case and the uncertainty of the District Court's disposition of this particular item, we feel constrained to remand the case to the District Court so that it may determine, consistent with the views herein expressed: (a) What part, if any, of the $40,225.15, cancelled in 1946 by the corporation, is not taxable in any year or event as income; or (b) is not taxable in the year 1946 as the equivalent of a dividend, because taxable in some other year, and if so, what years. This is a matter we cannot determine upon the record presently before us.

The decision of the District Court is reversed and the case remanded for further proceedings on the $40,225.15 item, in accordance with the aforesaid ruling of this court. The decision is reversed,

and judgment ordered in favor of the Commissioner, on all other items.

Reversed.

JAMES ALGER FEE, Circuit Judge (dissenting).

Since this case has been sent back for partial retrial, the grounds of this dissent should be set out. We should have affirmed the judgment of the trial court.

It is admitted that this is an appeal upon questions of fact. No legal principles are involved. This Court is not empowered to write new findings of fact. It can reverse when the findings are clearly erroneous only when, on the entire evidence, the reviewing court is left with a definite and firm conviction that a mistake has been made.

Therefore, we must be convinced from the record in the particular case that the mistake was made. Collateral considerations as to what some other trial court or any appellate court may have thought about some state of facts in a different case more or less remotely analogous are not proper for consideration.

Here our colleagues seem to rely, not on the record as a whole upon which the trial court based its judgment, but upon such remote analogies. Reliance is placed by them upon inferences drawn from the attitudes of other courts in a series of cases painstakingly accumulated by Judge Barnes which they feel command findings of fact contrary to those actually found by the District Court. Such a process equates a conclusion drawn on a cold record from an aggregate of facts with a rule of law.

The knowledge of local customs of business and personalities of witnesses is present with the trial judge. We know the business methods of New York City might lead to entirely different findings than those of Oregon. The trial judge in the vicinity is alone capable of appreciating the subtleties of his own business community. We should not attempt to build up an empirical rule of law which would bind this vast circuit.

The findings of the trial judge, based as they were upon intent of Colonel Woodlaw, should be controlling. The judgment of the sole stockholder and active manager of the corporation as to what measures were best for it could well be accepted by the trial judge.

The judgment should be affirmed.