**PACIFIC VEGETABLE OIL CORPORA-TION, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REV-ENUE, Respondent.**

No. 15273.

United States Court of Appeals
Ninth Circuit.

July 8, 1957.

Dudley F. Miller, San Francisco, Cal., William D. Evers, Washington, D. C., for petitioner.

Charles K. Rice, Asst. Atty. Gen., Karl Schmeidler, Sheldon I. Fink, Harry Baum, and Ellis N. Slack, Washington, D. C., for respondent.

Before ORR, POPE and FEE, Circuit Judges.

ORR, Circuit Judge.

Pacific Vegetable Oil Corporation, hereafter petitioner, in 1949 owned 40.4% of the outstanding stock of a corporation known as Western Vegetable Oil, Inc., hereafter Western.

In October, 1949, petitioner, together with other stockholders offered to sell to Western certain of its (Western's) capital stock. The offer was accepted. The minutes of the meeting of Western's Board of Directors in which the offer was accepted merely stated that the ac-

5. Finding of Fact XI which found paragraph XVI of plaintiffs' complaint untrue.

ceptance of the offer was "deemed to be in the best interests of the company." This is the sole evidence in the record concerning the purpose of the redemptions.

Petitioner reported as a dividend the sum of $296,120 it received from Western in exchange for 1,346 shares of Western's stock, and took a dividends received credit of 85%, permitted by § 26(b), I.R.C. of 1939, 26 U.S.C.A. § 26(b).

The Commissioner of Internal Revenue redetermined the tax by eliminating the dividend income and its offsetting credit, and assessing a long-term capital gain treating the distribution by Western in the purchase of its stock as in partial liquidation. The Tax Court sustained the Commissioner. We have the decision of the Tax Court before us for review.

The finding by the Tax Court that the distribution by Western in cancellation of stock held by petitioner was not essentially equivalent to the distribution of a taxable dividend under § 115(g), 26 U.S.C.A. § 115(g) but was a distribution in partial liquidation of Western under § 115(c) was a combined finding of fact and a conclusion of law. Earle v. Woodlaw, 9 Cir., 1957, 245 F.2d 119, certiorari denied 77 S.Ct. 1400.

■ The rule that we are bound by a finding of fact if not clearly erroneous does not carry the same impact in the instant case as it ordinarily does because here the evidence consists entirely of stipulated facts and documentary evidence from which we are free to draw our own inferences. Pacific Portland Cement Co. v. Food Machinery & Chem. Corp., 9 Cir., 1949, 178 F.2d 541; Smyth v. Barneson, 9 Cir., 1950, 181 F.2d 143.

■ In seeking a solution of whether the distribution in question was equivalent to a taxable dividend within § 115 (g) or was a partial liquidation under § 115(c), our path is made clearer by following certain bench marks outlined in the case of Earle v. Woodlaw, supra, recently decided by this court. In that case the Government was on the other side of the fence, from which we conclude that it approves the criteria set forth in Earle v. Woodlaw, but thinks that these criteria support a contrary finding in the instant case. Before attempting to demonstrate that the evidence in this case supports petitioner's contention it will be necessary to set forth some of the more pertinent and relevant facts.

The petitioner is a California corporation dealing in a world-wide trade in vegetable oils and other commodities. At the beginning of 1949, it had among its assets 2,094 shares of Western Vegetable Oil, Inc., hereafter "Western", constituting 40.4% of the outstanding shares of Western, all of which were common shares. Western, a California corporation also, produced and sold vegetable oils derived from copra and other materials.

Western's outstanding stock at the beginning of 1949 was held as follows:

| Stockholders | No. of shares | % |
|---|---|---|
| Pacific Vegetable Oil (Petitioner) | 2,094 | 40.4% |
| A. Schumann | 1,252 | 24.2 |
| Dow | 900 | 17.4 |
| Boomer | 250 | 4.8 |
| D. Burness | 178 | 3.4 |
| M. Burness | 178 | 3.4 |
| Estate of Denroche | 140 | 2.7 |
| Allan | 140 | 2.7 |
| P. Schumann | 25 | .5 |
| Nelson | 25 | .5 |
| | 5,182 | 100.0% |

Western held 978 shares as treasury stock acquired in redemptions prior to 1949. In April, 1949, Western redeemed 140 shares at a price of $120 per share held by the Estate of Denroche. In October, 1949, Western received offers to redeem at $220 per share from six of its shareholders, as follows:

| | | |
|---|---|---|
| Pacific Vegetable Oil (Petitioner) | | 1,346 |
| Allan | (All held) | 140 |
| D. Burness | " " | 178 |
| M. Burness | " " | 178 |
| P. Schumann | " " | 25 |
| Nelson | " " | 25 |

Western promptly accepted these offers, and purchased the proffered shares at $220 per share, and retired them. Thus, at the end of 1949, only 3,150 of the 5,182 shares outstanding at the beginning of 1949 remained outstanding; these shares were held as follows:

| Stockholders | No. of shares | % |
|---|---|---|
| A. Schumann | 1,252 | 39.75% |
| Dow | 900 | 28.57 |
| Pacific Vegetable Oil (Petitioner) | 748 | 23.74 |
| Boomer | 250 | 7.94 |
| | 3,150 | 100.00% |

In the first month of 1950 Western redeemed the offered shares of Dow and Boomer; consequently, only 2,000 shares remained outstanding, held 1,252 by A. Schumann and 748 by Pacific Vegetable. In the next month, Pacific Vegetable purchased 252 shares of Western stock at $220 per share from Schumann, to equalize the number of shares held by the taxpayer and A. Schumann at 1,000 each. Whereas Pacific Vegetable held 40.4% of the outstanding shares and needed the acquiescence of A. Schumann to control before the redemptions, Pacific Vegetable held 50% and still needed A. Schumann to control the corporation subsequent to the redemption.

The following is a table of Western's net income before taxes and dividends for the years 1947, 1948, and 1949:

| | Net Income (before taxes) | Dividends |
|---|---|---|
| 1947 | $1,069,837.49 | $103,640 |
| 1948 | 88,573.88 | 51,820 |
| 1949 | 358,814.71 | 50,420 |

At the end of 1949 Western's earned surplus stood at $768,299.64. At all times during 1949, Western's accumulated earnings and profits exceeded the payments made for stock which it acquired from the various stockholders.

Western carried on its oil manufacturing business until 1954, five years after redemptions in question.

An analysis of the evidence above set out requires the following answers to questions pronounced by the decided cases to be helpful in pointing up the true character, taxwise, of payments made by a corporation to its shareholders.

1 & 2. Did the corporation adopt any plan or policy of contraction of its business activities? Did the corporation follow an orderly procedure looking toward its ultimate dissolution, or its ultimate contracted operations?

We may say here as was said in Earle v. Woodlaw, in answer to the same question 245 F.2d 126:

> "Here there exists no satisfactory credible evidence that any plan or policy of contraction was ever adopted *by the corporation*. The *usual* place to find such a policy expressed is in the corporate minutes. No such expression exists here. The best *proof* is in the conduct of the corporate affairs in the period subsequent to the alleged date of adoption of the plan * * *."

Subsequent to the redemption Western carried on its manufacturing business at the same general level until 1954, when adverse conditions in the copra market caused it to terminate copra crushing operations, a factor indicative of a disguised dividend. Earle v. Woodlaw, supra; Commissioner of Internal Revenue v. Roberts, 4 Cir., 1953, 203 F.2d 304; Boyle v. Commissioner, 3 Cir., 1951, 187 F.2d 557; Rheinstrom v. Conner, 6 Cir., 1942, 125 F.2d 790, certiorari denied 317 U.S. 654, 63 S.Ct. 49, 87 L.Ed. 526; Flanagan v. Helvering, 1940, 73 App.D.C. 46, 116 F.2d 937.

A negative answer to the first two questions is required.

3. Did the initiative for the corporate distribution come from the corporation, based on usual business considerations, or did it come from stockholders, for their own purpose? The shareholders made the offer to the corporation; in the absence of any corporate purpose from either the minutes or subsequent operations, the inference is compelled that such offer was made for the stockholders own purpose.

4. Is proportionate ownership of stock by shareholders changed?

The answer is "no". If the control of the distributing corporation or the relative position of the principal shareholders of the distributing corporation as a practical matter remains the same after the redemption as before, this fact is indicative that the distribution was essentially equivalent to a taxable dividend. Commissioner of Internal Revenue v. Roberts, supra; Boyle v. Commissioner, supra.

Before the redemption Pacific Vegetable held 40.4% of Western's outstanding shares, and needed the concurrence of A. Schumann to control Western; after the redemption, Pacific Vegetable owned 50% of Western's outstanding shares, and needed the concurrence of A. Schumann to control Western. This essential relation of Pacific Vegetable and A. Schumann, the principal shareholders, remained substantially the same after the redemption.

5. What were the amounts, the frequency, and the significance of dividends paid in the past?

The dividend record for 1947, 1948, and 1949 is set out above. While the amount of dividends to be paid was a matter left to the judgment of the directors, the presence of both high earnings and relatively low dividends may have some significance as indicating a desire to withdraw those accumulated earnings and profits.

6, 7 & 8. Does the capitalization, at the time of cancellation of the stock, represent capital paid in, or earnings from the business? Was there a sufficient accumulation of earned surplus to cover the distribution, or was it partly from capital? Was there a maintenance of a relatively similar amount of capital liability, or did that figure decrease to a degree somewhat comparable to the purported distribution of capital?

All of the distributions in redemption of stock were charged to earned surplus;

there was no accompanying capital reduction. For the year 1949 the earned surplus of Western was reduced from $768,229.64 to $503,756.80. Net income before taxes for 1949 was $366,416.03. The amount paid by Western to the stockholders from whom it purchased stock during 1949 was $433,040.

9. Was there good faith, or bad, in the action of the Board of Directors?

Here again we think a quotation from Earle v. Woodlaw provides an answer:

"The question of 'good faith' was in earlier cases held important. It is now considered of such little importance that it is practically immaterial. In any event, we need not question the good faith in this case."

10. What was the net effect of the actions taken?

The answer to this question is very important in the solution of whether the payment to the stockholder was essentially equivalent to a dividend or was a distribution in partial liquidation.

We conclude that the net effect was to leave Western in the same position insofar as operational purposes were concerned as before the sale. It carried on the business in the same manner to the same, or even larger, extent.

Insofar as the redemption of the capital stock held by petitioner is concerned, the distribution accomplished the same result as the declaration of a dividend. It is clear that the purchase of its capital stock by Western in no manner or form tended to accomplish a partial liquidation. It did no more than to eliminate certain stockholders and thereby enhance the value of stock in the hands of remaining stockholders.

Reversed.

JAMES ALGER FEE, Circuit Judge (specially concurring).

The findings of fact of the Tax Court were "clearly erroneous," as we all agree. From a reading of the record, we are all convinced that a mistake of fact has here been made by that tribunal.

In accordance with the dissent in Earle v. Woodlaw, 9 Cir., 245 F.2d 119,

132, we should hold that the questions here are of fact and not of law. We should not crystalize these factual formulae and thus mold decisions of future situations the facts of which are still unknown. The finders of fact should be permitted to meet new situations and solve them in the light of the statutes and rules of law. Likewise, the mere circumstance that the facts have been stipulated does not free this Court from the rule that we have no power to find facts and are confined to the adjudication that the facts found by the trial court are acceptable or are in material respects clearly erroneous.